Syllabus.

## THOMAS WATSON v. HENRY S. AUSTIN ET AL.

1. SALE OF LAND. *Rescission of contract. Fraudulent misrepresentation. Examination by vendee.*
    A court of equity will not grant a prayer for the rescission of a contract for the purchase of land because of fraudulent misrepresentations by the vendor as to the character and location of such land, the falsity of which representations the most cursory examination would have disclosed, when it is shown that the vendee sent an agent and afterward went himself to examine the same.

2. SAME. *Specific performance of contract. Bill to enforce. Concealment as to title.*
    A court of equity will not enforce the payment of notes given for the purchase-money of land, if the vendee show that the vendor concealed such facts in reference to his title to the land as cast a well-founded doubt upon the title, if the vendee has not waived objection on account thereof, even though such concealment may have been made in good faith.

3. SAME. *Contract nullified. Reconveyance of title.*
    And, in such case, the vendor is entitled to a reconveyance of the land on the repayment to the vendee of the amount paid by him for the same.

4. SAME. *Fraud shown therein. Rescission of contract denied. Case in judgment.*
    B. was declared a bankrupt, and A. was made the assignee of his assets. H., a clerk of A., became the purchaser of the equity of redemption of certain land at the sale made by the latter as assignee of B.'s assets. H. paid no money for the land, and whether he ever received a deed thereto is questionable. H. conveyed the land by quit-claim deed to A. A. then, for a valuable consideration, conveyed a one-half interest in the land to W., who accepted quit-claim deeds to the same from A. and H. afterward. A. and B., the latter having bought in and cancelled the incumbrance on the land, sold one-half the remaining half of this land and a three-fourths interest in another tract to W., who paid a part of the purchase-money in cash and executed four equal promissory notes for the remainder, and received quit-claim deeds from A. and H., as arranged by them and B. When the first two notes had fallen due A. commenced a suit in attachment in chancery to enforce the payment of the same. W. filed a cross-bill against A. and B., setting up a concealment of the facts in reference to the acquirement of title by H., and praying a rescission of the contracts of sale. H. was not made a party to the suit. It was shown that the other two notes were settled pending this suit, but in what manner was not clearly shown. *Held*, that, treating the defense set up by W. against the suit on his notes as good, still he is not entitled to a rescission of the contracts of sale, upon his cross-bill, for four reasons: (1) The sale of the·first half interest in the land has no connection

with that of the other interest subsequently sold; (2) H., one of the gran-
tors, is not a party to the suit; (3) it is not shown whether the two notes
settled, pending the suit, were paid or otherwise settled; (4) it does not
appear what injury has been done to the land by trespassers between the time
W. obtained knowledge of the fraud upon him and the time of filing his
cross-bill. It is a proper disposition of the case to dismiss both the original
bill and the cross-bill without prejudice.

APPEAL from the Chancery Court of Hinds County.

HON. E. G. PEYTON, Chancellor.

The case is stated in the opinion of the court.

*Frank Johnston* and *J. R. Yerger,* for the appellant.

1. What title did Howard acquire? The delivery of the deed
from Austin, assignee in bankruptcy of Baldwin, to Howard, was
indispensable to its validity. The sale to Howard was a nullity.
The most essential and effective act in making a deed is the de-
livery. *Armstrong* v. *Stovall,* 4 Cush. 275; *Stone* v. *Montgomery,*
6 George 83; *Oliver* v. *Stone,* 24 Ga. 63.

A deed is not valid until delivered to and accepted by the
grantee or some one for him. *McGehee* v. *White,* 2 George 41;
*Bullitt, Muller & Co.* v. *Taylor,* 5 George 708.

Mere manual delivery is not enough. There must be an accept-
ance and assent that the deed shall be operative as a contract.
*Kearney* v. *Jeffries,* 48 Miss. 343.

And where a deed is retained in the possession of the vendor, to
constitute a delivery, the retention must be by agreement of the
parties a delivery. *Wall* v. *Wall,* 1 George 91.

But in the case at bar, Austin's own sworn statement absolutely
excludes every possible legal conception of a delivery, actual or
constructive. The deed was never delivered manually; the bid
was not paid, never intended to be paid, and, in a word, the pur-
chase was abandoned. It is too clear for argument that Howard
did not acquire the title that was placed in the bankrupt estate, and
he could confer no title upon Mr. Watson. The only remaining
question on this branch of the case is whether the title which went
by operation of law into the bankrupt court for the administration
of the bankrupt's estate reverted to Baldwin, the bankrupt. Upon

the legal principles which govern this subject it is quite clear that it did not.

In *Thomas* v. *Atwood* this court decided that the title of a bankrupt vests by operation of law in the assignee, and this in a case where the particular property had not been placed on the schedules in the proceedings. And it was further said that it must be shown distinctly that the title had reverted to the bankrupt. In that case nothing was shown except the fact of the bankruptcy, and an action of ejectment by the bankrupt many years after the date of proceedings in the bankrupt court.

*Atwood* v. *Thomas* was distinguished broadly from *Conner* v. *Southern Express Company*, decided by the Supreme Court of Georgia (42 Ga. 37), where it appeared that the proceedings in bankruptcy had been concluded and the assignee discharged. In *Conner* v. *Southern Express Company* much stress was laid upon the fact that the assignee had been discharged, as raising in itself the presumption that there had been a full administration of the estate. *Atwood* v. *Thomas*, 60 Miss. 162.

The question was treated more elaborately in *Saunders* v. *Mitchell*. It was said by Judge Cooper, delivering the opinion of the court, that the bankrupt law makes no provision for the reconveyance of the property to the bankrupt. He is entitled by operation of law to the surplus. But this includes the idea of a complete administration of the trust; it really involves the idea of a payment of the debts, or the lapse of time of common law which would raise the presumption of payment. But in order to declare that the title has reverted to the bankrupt there should be clear proof that the trust in the bankrupt court has been fully administered, and that the particular property is the surplus remaining. So, in the case cited, it was said by the court: " We are not prepared to say that this [the lapse of many years] would not be sufficient to authorize the recovery of the land in an action of ejectment brought by the bankrupt. If, also, it should be made to appear that the debts had been actually paid, or if there was clear proof of the abandonment of the property by the assignee and the creditors, we are unable to see why such action might not be brought." *Saunders* v. *Mitchell*, 16 Miss.

In the case at bar the pretended bankrupt sale was made in September, 1880. The assignee has never been discharged. There is no evidence of the payment of the debts or any abandonment by the creditors. Indeed, there is no evidence whatever on the subject, except the bankruptcy, the fraudulent and void sale in 1880, the existence of creditors, and the fact that the assignee has never been discharged. It is, therefore, certain that Baldwin had no title to convey, and Mr. Watson acquired no title from him.

So far as the creditors are concerned in respect to this fraudulent contrivance between Austin, assignee, and Howard, it was a concealed fraud, and no statute would run against them until its discovery. There can be no possible doubt that the title to all these lands is now in the bankrupt court at Chicago. This case is one of a total failure of title coupled with a shameful concealment of the material facts which, if revealed, would have made its worthlessness instantly apparent. On this ground alone the bill should have been dismissed, or at the instance of the appellant he should have been placed *statu quo* by a total rescission of this contract.

2. " *He who comes into a court of equity seeking relief, must come with clean hands.*" The specific performance of a contract is not a matter of absolute right, but rests largely in the discretion of the court. 3 Pomeroy Eq. Juris., § 1404; *Daniel* v. *Frazer,* 40 Miss. 507; *Clement* v. *Ried,* 9 S. & M. 535.

So tender is a court of conscience in exercising this power of compelling the specific performance of contracts, that it demands in all cases that the " contract must be perfectly fair, equal, and just in its terms and in its circumstances." 3 Pomeroy Eq., § 1405, note 3.

With respect to the effect of a misrepresentation upon the specific performance of a contract, a party making a statement as true, *however honestly,* for the purpose of influencing the conduct of the other party *is bound to know* that it is true, and must stand or fall by his misrepresentation. The point upon which the inquiry turns is the fact of the other party having been misled by a representation calculated to deceive him. Of course, when the representation is so coupled with knowledge, or want of belief or intent as to

constitute actual fraud in any of its phases, it will *a fortiori* defeat the remedy of specific performance. 2 Pomeroy Eq. Juris., § 889.

"And, moreover, it is not necessary that the false representation should be the sole inducement. Where several representations have been made, and one of them is false, the court has no means of knowing, as was well said by Lord Cranworth, that this very one did not turn the scale." 2 Pomeroy, § 890, p. 375.

In *Reynell* v. *Sprye*, 1 DeG., M. & G. 660, *et seq.*, Lord Cranworth on this precise question said : "No question can arise in a case like the present, where one contracting party has *intentionally* misled the other by describing his rights as being different from what he knew them really to be. In such a case it is no answer to the charge of imputed fraud to say that the party alleged to be guilty of it recommended the other to take advice, *or even put into his hands the means of discovering the truth.* However negligent the party may have been to whom the incorrect statement has been made, yet that is a matter affording no ground of defense to the other. No man can complain that another has too implicitly relied on the truth of what he has himself stated. That, however, is not sufficient in a case of misrepresentation ; he must be shown clearly to have had information of the real state of facts." *Reynell* v. *Sprye*, 1 DeG., M. & G. 660 ; 2 Pomeroy Eq. 384.

On the subject of the fraudulent concealment of material fact, a few authorities will be briefly referred to : 2 Pomeroy Eq. Jur., §§ 900, 904 ; *Davidson* v. *Mors*, 5 H. 673 ; *Endicott* v. *Perry*, 14 S. & M. 144.

In respect to the purchase of the mortgage, there was both fraudulent misrepresentations and concealments. There were false representations made in regard to Howard's title. The attention of the court, in the application of the law, is called to the following facts : There were fraudulent representations in respect to the land lying in a body, its value, and timber ; the fictitious letter from Butts ; and there was a fraudulent concealment of the fact that the land was full of adverse claimants.

3. The case has been presented on the *distinct* ground that the specific performance of this contract cannot be enforced by a court

of equity, and that the bill should in any view be dismissed. On well-settled principles, the denial of specific performance and a decree for a rescission of a contract are often distinct. And it by no means follows that where a rescission would be denied specific performance would be decreed. *Hester* v. *Hooker*, 7 S. & M. 768.

But this case demands a rescission of the whole contract, with all the remedial decrees that can be made by a Mississippi court. Any false or fraudulent representation in respect to material facts will entitle a purchaser to a rescission, and the case of *Gilpin* v. *Smith* furnishes a good illustration of the principle. *Gilpin* v. *Smith*, 11 S. & M. 109; see also *Allen* v. *Bratton*, 47 Miss. 119.

*As to delay and non-action*, we affirm that no case can be found where there were actual and intentional fraudulent representations or concealments, holding the rule that mere delay and non-action has bound the defendant by his adversary's fraud, or deprived him of his defense against a specific performance. But Mr. Watson has been guilty of no delay. As to *acquiescence* and *acts of ownership*, the true facts of the case furnish a sufficient answer. On October 11, 1882, Watson and Austin made what is conceded to have been an attempt at a compromise of the trade, and Mr. Watson paid one thousand dollars on this compromise. It was based on some theory of reducing the price on the ground of a partial failure of title, and was most unquestionably made at a time when Mr. Watson *was ignorant* of the facts attending the Howard title, and, moreover, when he was threatened with suit, if not actually sued, suspecting trickery, and in the dark about the real facts and fully " under the influence of the previous transaction."

Acquiescence implies full knowledge ; *and, moreover, the proof of knowledge lies on the party who alleges acquiescence and sets it up as a defense.* 1 Sugden's Vendors, p. 385 and 386, and par. 32 and 33; note G, and cases cited.

Again, a complete answer is that this attempted compromise has been *abandoned by both parties*, and Austin goes to the length of claiming that the money paid on it by Watson belongs to him by way of a penalty or a forfeiture.

*Frank Johnston* also argued the case orally.

*E. E. Baldwin*, for the appellees.

1. In a bill praying for a rescission on the ground of fraud in the sale, the following must be shown:

1st. The misrepresentation, to be actionable, must precede the sale, or be concurrent with it. *Hogan* v. *Plympton*, 11 Pick. 97; *Blass* v. *Kittridge*, 5 Vt. 28.

2d. The false assertions must be made with an intent to defraud. The vendor must be aware of the falsity of his misrepresentations, and there must be an injury to the vendee. *Toms* v. *Wilson*, 81 Ill. 529; *Taylor* v. *Scoville*, 54 Barb. 34; *Weed* v. *Case*, 55 Barb. 534; *Meyer* v. *Yesser*, 32 Ind. 294; *Hammond* v. *Emmerson*, 27 Maine 308.

3d. It must appear that the vendee did not trust to his own knowledge or examination, or upon the knowledge of any third party, but relied solely on the statement of the vendor. *White* v. *Watkins*, 23 Ill. 480; *Fauntleroy* v. *Wilcox*, 80 Ill. 477; *Tuck* v. *Downing*, 76 Ill. 71; *Roberts* v. *Bitzer*, 53 Ill. 466.

4th. If the truth could have been ascertained by ordinary vigilance or ordinary diligence and prudence, the representations are not actionable. *Tuck* v. *Downing*, 76 Ill. 71; *Bond* v. *Ramsey*, 89 Ill. 29; *Rockafellow* v. *Baker*, 41 Pa. St. 321; *Mooney* v. *Miller*, 102 Mass. 220; *Brown* v. *Croths*, 11 Cushing 348; *Brown* v. *Leach*, 107 Mass. 364.

5th. The right of the vendee to rescind in case of fraud must be exercised within a reasonable time after the sale. The right to recover may be exercised so long as any of the purchase-money is unpaid. *Grymer* v. *Sanders*, 3 Otto 55.

If a party, with full knowledge that he has been defrauded in the purchase of real estate, proceeds to execute the contract on his part by payments of portions of the purchase-money, it is a waiver of the fraud, and he is not subsequently entitled to a rescission of the contract, or if he obligates himself anew to perform it he waives any fraud. *Pintard* v. *Martin*, 1 S. & M. Chy., 126; *Knackalls* v. *Lea*, 10 Humph. (Tenn.) 577.

When the vendor of land, knowing of a claim of others to nearly one-half the land, sells it without disclosing such claim to

the vendee, on discovering such claim the vendee is entitled to annul the bargain; but he must declare his intention to do so at once, and if he goes on afterward making payments and otherwise ratifying the contract, he cannot claim a rescission of the contract. *Pollard* v *Rogers,* 4 Call. (Va.) 239.

When A. sold a tract of land to B., representing that it contained only fifty or sixty acres of untillable land, when, in fact, it contained three hundred acres of such land, but it appeared that B. several times went over the land and examined it for himself, the court refused to rescind the contract on the ground of misrepresentation. *Halls* v. *Thompson,* 1 S. & M. 443.

Now, if we compare the foregoing principles with the facts of this case as shown by the evidence, we do not find that in a single particular does the complainant in the cross-bill (the appellant) bring himself within the rules prescribed. It is not shown that any misrepresentations were made with intent to defraud, or that any injury has been done to the vendee in any way. No one has attacked his title but himself. No creditor of Baldwin's claims that anything was wrong about the bankrupt sale. No one in Georgia sets up any adverse title, and either attempts to oust Watson or to bar him out of possession. On his part it is a clear case of suicide.

Again, the evidence shows that the vendor advised him to examine fully into the whole matter, both as to the lands and their title, and informed him that there were some squatters on the lands; that Watson examined the lands himself, and sent a man to examine them and their title, and that he relied on the knowledge thus acquired in making the purchase, and not on knowledge derived from the vendor. That it was easy to find out any and everything in regard to the land, and that he did find out all about the whole matter.

Again, after the purchase was consummated, we find nothing is claimed to be wrong until the first note becomes due, when the cry of fraud is immediately raised and payment is refused. No offer is made to rescind, however, until nearly four years afterward, during all which time the vendee retains the property and does not

offer to give it up.   During this time he deeds an interest in it to his son, M. D. Watson; he pays a part of the purchase-money through Mr. Phillips; he makes option contracts for the sale of the property; and he makes conditional agreements for the settlement of this balance of the purchase-money.   All this he does at dates long subsequent to the time when he claims to have discovered the fraud, and commenced charging it upon his vendor.

2. A holder of a quit-claim deed cannot rescind for defect of title.   *Pintard* v. *Martin*, 1 S. & M. Chy., 126 ; *Joseph* v. *Hamilton*, 3 Dana (Ky.) 280 ; *Bates* v. *Delavan*, 5 Paige (N. Y.) 299 ; 44 Ill. 68 ; 75 Ill. 132.

In such a case actual fraud must be shown to have been practiced by the vendor on the vendee, and that the vendee was deceived by it.

A mistake in regard to the title or quantity of land is no ground for relief when the contract of purchase is without warranty. *Sutton* v. *Sutton*, 7 Grat. 234.

For in such case the deed only proposes to convey the title which is in the vendor, and no more ; just that alone, such as it is. The law of this case is well set forth in *Commonwealth* v. *McClanachan's Ex'r*, 4 Rand. (Va.) 482, and many cases cited.

3. A question has been raised as to the delivery of the assignee's deed from Austin to Howard.   In regard to this, we say that the validity of this transaction has never been questioned by the only persons who could legally question it, to wit, Howard himself and the creditors in bankruptcy of M. S. Baldwin, consequently it must stand good as to all the world.

We insist that there was a good delivery of the deed under the laws and decisions of Georgia, which must govern in this particular, inasmuch as the deed shows that it was duly acknowledged. The following rulings are conclusive upon this point:

" If a deed be signed and sealed and delivered in the presence of the attesting witnesses, to be delivered as his deed, it is an effectual delivery, provided there be nothing to qualify the delivery, notwithstanding the grantee was not present, nor any person in his behalf, and the deed remained under the control of the grantor." *Rashin* v. *Shields & Ball*, 11 Ga. 636.

" A deed takes effect from delivery, which may be by words or by acts without words; and to the grantee or to a third person without especial authority from the grantee to receive the same."

" It is not essential to the delivery of a deed that the grantee be present personally to accept the same."

" The mere retention of a deed by the grantor will not affect its validity, unless it is agreed and understood at the time that the deed is not to pass out of the grantor's possession." *Welborn* v. *Weaver*, 17 Ga. 267.

*E. E. Baldwin* also made an oral argument.

COOPER, C. J., delivered the opinion of the court.

Prior to the year 1878, the appellee, M. S. Baldwin, was the owner of a tract of land in the State of Georgia comprising some sixty-eight thousand acres, upon which he had executed a mortgage to secure a debt of about forty thousand dollars due to one Loud. In the year 1878 he was adjudicated a bankrupt in Chicago, Ill., and the appellee, Austin, was appointed assignee of his estate. By an order of court the assignee was directed to sell the equity of redemption. It was advertised, exposed to sale, and a report made to the court that it had been sold to one Howard at the sum of one dollar and a-half, and this sale, so reported, was confirmed. Baldwin, the bankrupt, was afterward discharged, under proper certificate, but there has been no final discharge of the assignee. The circumstances of the sale to Howard will be more fully referred to in a subsequent part of this opinion. In giving a history of the title it is now only necessary to say that Howard, soon after his purchase, conveyed the land to Austin by quit-claim deed. Austin and Baldwin agreed between themselves to divide whatever could be realized either by selling the equity of redemption to the holder of the mortgage given to Loud if he could be discovered (who, it was thought, would give something for it to avoid the necessity of foreclosing the mortgage) or by selling to others. In May, 1881, Baldwin learned that the mortgage had been assigned to parties in New York who had been adjudged bankrupts, and made a contract by which he could become owner of the mortgage

by paying about the sum of five hundred dollars. In June or July, 1881, Watson, Baldwin, and Austin were brought together by one Scriven. The appellant contends that Scriven was the agent of the appellees, sent out by them to inveigle him into their net, while the appellees claim that Scriven was the agent of the appellant hunting a bargain. The view we have taken of the case renders a consideration of this matter immaterial. So it was that the parties came together and the appellant agreed to give seven thousand five hundred dollars for a half interest in the land, if the mortgage could be secured and cancelled.

Before this contract was consummated Watson employed an attorney, Mr. Gardner, who examined such abstracts of title as were submitted to him, and, at his suggestion, a young attorney, Mr. Fessenden, was sent to Georgia to verify the abstracts, examine the title, and make an examination of the land. Fessenden returned, and having made a favorable report, the purchase was consummated, Watson paying the agreed price and accepting quit-claim deeds from Austin and Howard. In a few months another proposition was made by Watson to purchase a half interest in the half interest which had been retained by the vendors in this tract, and also of a three-fourths interest in another tract of about four thousand acres, of which Austin and Baldwin had obtained control; and after some further examinations of the property by Mr. Watson he became the purchaser of this interest, agreeing to pay therefor the sum of twenty-five thousand dollars. Of this sum he paid in cash three thousand dollars, and for the remainder executed four notes of equal sums. This suit, which is an attachment in chancery, is brought by Austin to enforce the payment of two of said notes. It was instituted on the 10th day of January, 1883, and soon thereafter Watson filed his answer. In the progress of the cause it was developed that Baldwin was interested in the notes, and upon motion of the defendant the complainant was required to amend his bill so as to make him a party to the suit. In March, 1885, Watson, by leave of the court, exhibited his cross-bill against the complainant and his co-defendant, Baldwin, praying for a rescission of the contracts of purchase made by him

and for a personal decree against Austin and Baldwin for the sums paid out by him on account thereof. The grounds upon which he seeks rescission are stated both in his answer and cross-bill. So far as they are necessary to be stated they are about as follows :

They may be classed under three heads, first, misrepresentations as to the character and value of the lands ; second, misrepresentations as to the recorded title ; and, third, fraudulent and injurious concealment of facts affecting the title which did not appear on record.

The misrepresentations of the first class as stated by Watson are that Austin and Baldwin assured him that the lands were finely timbered, all in a compact, unbroken body, and were accessible to transportation facilities by rail and water, and were of great value, while in truth they were not finely timbered but much of the timber had been cut off by trespassers ; they were not accessible to transportation ; they did not lie in a compact body, and were not of great value. The misrepresentations of the second class were that Austin and Baldwin furnished only a partial abstract of title, and withheld those portions which showed that a part of the lands had been sold by the grantor from whom Baldwin acquired them before his sale to Baldwin, and that Baldwin himself had sold several thousand acres to other persons before becoming a bankrupt.

It is sufficient to say, without going through with the many facts proved or disproved in the very voluminous record before us, that it is well established by the evidence that Watson had caused an agent to be sent to Georgia before making either purchase to examine the land and the title thereto, as shown by the records in that State, and before the second purchase he himself had gone there, and must be held to have acted on the examination made by himself or his agent. If this examination was not as thorough as prudence would have seemed to require, it was his fault not to have made it more complete, and he cannot complain of a defect in a matter which he had undertaken to examine for himself and which would have been discovered by the exercise of the slightest

care. We speak now of the complaints made by him that the land was not well located, had been denuded of much of its timber, was not in a compact body, and was occupied by numberless intruders. The most cursory examination would have necessarily disclosed the truth in these respects.

Upon the second class of misrepresentations charged it is only necessary to say that the evidence is conflicting, and while Watson declares that he never was informed of the prior conveyances made by Loud (Baldwin's grantor) and by Baldwin, both Baldwin and Austin aver that he was fully advised, and Baldwin testifies that a reduction from the purchase price was made because of them. In any event, the extent to which he, Watson, could be relieved on this ground would be to have an abatement of a proportionate part of the purchase-money.

Before considering the remaining ground upon which the defendant seeks to be relieved, it becomes necessary to state other facts which have been heretofore omitted, because they can be more intelligibly set out in connection with the specific defense to which they give rise. This defense is, that the vendors fraudulently concealed matters *en pais*, which defeat or render doubtful and hazardous the title they undertook to confer upon the purchaser. The facts are, that at the sale made under the order of the bankrupt court, one Howard, who was a clerk or employee of Austin, the assignee, appeared at the sale and bid for the land, which was struck off to him at and for the sum of one dollar and a half; but he declined to consummate his purchase, paid no part of the bid, but permitted Austin, the assignee, to stand in his place, and made him a quit-claim deed to the land. This deed, and the fact that Howard had withdrawn from the purchase, were intentionally concealed by Austin from Watson. Austin states in explanation of this that he did not desire to have it known that he had title to the land for fear that Watson would demand of him a warranty deed, which he was unwilling to make. Throughout the whole negotiations Austin represented to him, Watson, that he was acting as the agent of Howard, and the deeds which were given to Watson were executed by Baldwin (from whom the title had passed by his

bankruptcy) and by Howard, who, if he had ever had any title, had before that conveyed it to Austin.

Austin admits that he represented to Watson that the title was in Howard, and it is evident that the first information to the contrary which he had was derived from a suit instituted by Howard against Austin, Baldwin, and Watson in Chicago, in November 1882. In that suit Howard charged that he had purchased the Georgia lands at the assignee's sale, but that, as he soon afterward left the city of Chicago, he, at Austin's solicitation, authorized him to sell them; that Austin, acting as his agent, had made sale to Watson, but had taken the notes payable to himself, had converted to his own use the cash paid by Watson, and declined to account to him, Howard, for any portion of the proceeds or to recognize him as entitled to any part thereof; he prayed an injunction against the payment of the notes to Austin or Baldwin, and that his rights be declared and preserved. In answer to this bill, Austin, by his *sworn* answer, states, " that complainant never at any time held any title, legal or equitable, to any portion of the property in his bill mentioned, that is to say, he never paid anything whatever in the premises; the assignee's deed was never delivered to him, and was never in his possession nor in the possession of any one for him." So in this case the defendant, Watson, plants himself upon the proposition that the assignee's deed never having been delivered, Howard never had title, and that, having no title, he could convey none either to himself or to Austin, and that since he has acquired no title, by reason of facts known to Austin at the time of the sale, but unknown to him and studiously concealed from him, he should not be required to pay the notes given in the belief that he was to acquire title. In the present bill, the defendant to the cross-bill, Austin, says in response to the allegation that the deed was never delivered, " that it was delivered to the complainant, Watson." In his testimony he states that he does not recollect whether or not there was a delivery of the deed.

It is thus seen that it is, to say the least, left doubtful exactly what the condition of the title is. If there was, in fact, no delivery of the deed from Austin, assignee, to Howard, it must be true that

Howard never had title, for if anything can be considered and held as settled in law, it must be that delivery is necessary to the validity of a deed. We are not considering what is sufficient evidence of delivery, but the necessity of it as a fact. It certainly cannot be argued that a deed, though signed, sealed, and acknowledged before witnesses and before an officer, and retained in the possession of the grantor, can be said to be delivered against the express repudiation by the grantee and a consent to such repudiation by the grantor. Assuming for the present that Watson has not waived his right of rescission or defense, ought the court to require him to accept or to retain the title, clouded and impaired by the uncertainty which is cast upon it by these facts, known to Austin but unknown to him at the time of the purchase? Would any prudent counsel advise a client to accept a quit-claim deed to property under such circumstances? It appears by the evidence that there are many trespassers upon the land; suppose, now, that Watson should sue and recover possession. He is met by a plea of not guilty and is put upon proof of his title; necessarily he must deduce it through Baldwin, and his bankruptcy vests his title in his assignee. Would it not devolve upon him to show that it passed out of the assignee by a *deed delivered* to Howard? What chance for recovery would he have if it be a fact that the purchase was repudiated by Howard, the repudiation assented to by the assignee, and the deed never delivered nor held by any one for him?

Nor does it devolve on Watson to show that there was, in fact, no delivery. It is sufficient for him to establish a well-founded doubt of the delivery, for by concealing the facts Austin must be held to have asserted in effect that there was nothing known to him which would cast a well-founded doubt upon the title he was agreeing to have conveyed to Watson, and when Watson shows that there is a well-founded doubt existing by reason of the concealed facts, he shows that he has not received what he contracted for, nor has Austin given what he agreed to give.

But suppose the facts to be, as we are strongly impelled to believe the truth is, that Howard was a mere figure-head, bidding at a sale made by Austin, as assignee, for the benefit of Austin as an

individual, or, what is the same thing, that Howard, having made his bid, permitted Austin to substitute himself in his place. Can it be said that if these facts had been stated to the bankrupt court it would have confirmed this sale ? Was not Austin while he held the lands, or Watson, now having notice of how he held them, liable to be converted into a trustee for the creditors of Baldwin ?

Whatever may have been Mr. Austin's good faith in concealing these facts from Watson, it must be that they are full of danger to him either in asserting his title against those in the adverse possession of the lands or of defending it against the creditors of Baldwin. And since this danger was one which he did not undertake to incur, its existence must discharge him from responsibility to pay for a title thus surrounded with difficulties that which he agreed to pay for a title not thus imperiled.

We see nothing in anything done by Watson since discovering the defect noted that should preclude him from resisting the payment of the unpaid purchase-money. He seems to have made many efforts to adjust the litigation in which he has been involved, but throughout all this time he has stood by his answer in which his defense has been asserted, and we are unable to deduce from any of his acts an affirmance of the contract.

We are, however, of opinion that the court properly refused to rescind the contracts of sale. In the first place, the sale of the first half interest has no sort of connection with that of the other interest sold subsequently ; it is a separate, independent transaction ; secondly, Howard, the grantor, is not a party to this suit; thirdly, the settlement of the other notes was made pending the suit, and it is not clearly shown whether they were paid, or, as suggested by Watson, taken by him at an insignificant valuation from Baldwin in another transaction ; fourthly, we do not know what injury has been done to the property in Georgia by trespassers between the time that Watson obtained knowledge of the fraud and the time that he filed his cross-bill for rescission. Under these circumstances we think we go far enough in denying relief to the complainant and in dismissing the cross-bill without prejudice to Watson, so that he may take such steps as he may be advised in the courts of

Georgia, in which alone can a lien be fixed in case a rescission is thought proper. Since Watson successfully defends against the notes for the unpaid purchase-money, it is but proper that Austin's right shall be recognized to proceed in a proper suit to take an account of the money paid by Watson, upon the repayment of which title should be reconveyed to the proper party.

*Decree accordingly.*